**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK YI, an individual, as successor in interest to OE SUN YI, <br><br> Plaintiff, <br><br> v. <br><br> CIRCLE K STORES, INC., <br><br> Defendant. | CV 16-2171-RSWL-AJWx <br><br> **ORDER re: Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment [30]** |

Currently before the Court is Defendant Circle K Stores Inc.'s ("Defendant") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Motion" or "Motion for Summary Judgment"). Having reviewed all papers submitted pertaining to this Motion, the Court **NOW FINDS AND RULES AS FOLLOWS:** the Court **GRANTS** Defendant's Motion [30].

///

# I. BACKGROUND

## A. **Factual Background**

Plaintiff operates a gas station in Los Angeles ("the Station"). Compl. ¶¶ 1, 4, ECF No. 1-1. His mother, the late Mrs. Oe Sun Yi ("Mrs. Yi"), previously operated the Station as a franchisee to ExxonMobil Corp., Inc. ("Exxon"). Id. at ¶¶ 6, 18. Elizabeth Yi is Plaintiff's sister and Mrs. Yi's daughter, and she is a non-party to the action. Decl. of Anthony D. Phillips ("Phillips Decl.") Ex. A, at 15:20-23. Defendant owns and operates gas stations and convenience stores. See Compl. ¶ 2; Decl. of Timothy S. Tourek ("Tourek Decl.") ¶ 3.

Until 2011, Mrs. Yi was the franchisee and Exxon was her franchisor. Id. at ¶ 6; Phillips Decl. Ex. B, at 18:16-21. In June 2011, Exxon and Defendant agreed that Defendant would purchase Exxon's property and contractual interest in approximately 400 Mobil-branded retail fuel stations in Southern California, including Mrs. Yi's Station. Tourek Decl. ¶ 4. Pursuant to California Business & Professions Code § 20999.25(a), before Exxon sold the Station to Defendant, Mrs. Yi had a legal right to a bona fide offer from Exxon to purchase the Station. Id.

On October 20, 2011, Exxon sent Mrs. Yi the "Terms and Conditions of Bona Fide Offer of Sale" for the Station. Phillips Decl. Ex. D, at 4. Exxon offered to sell Mrs. Yi the Station for $2,611,000. Id.

Defendant had sent Mrs. Yi a letter, dated October 7, 2011, entitled "Assignment Offer" ("Assignment Offer"), requesting that she assign Defendant her right to receive a bona fide offer from Exxon.  Phillips Decl. Ex. E, at 131.  In exchange for assignment of Mrs. Yi's right to the bona fide offer, Defendant would be "willing to sit down . . . and negotiate a mutually agreeable sale of the [Station] . . . after [Defendant] closes its purchase of the [S]tation from [Exxon]." Id.  Before executing the Assignment Offer, Plaintiff called Timothy Tourek—the West Coast Vice President of Operations at Defendant's indirect parent company—asking where Mrs. Yi should fax the Assignment Offer.  Phillips Decl. Ex. B, at 62:3-63:3, 47:25-48:15.  Mrs. Yi signed and Plaintiff faxed the Assignment Offer on her behalf by the due date.  Id. at 44:13-14, 65:5-20.

In Fall 2013, a Hopkins Appraisal Report for Defendant appraised the Station at $3.6 million. Tourek Decl. Ex. 1.  On September 18, 2013, Plaintiff emailed Defendant that he and Mrs. Yi would accept the Assignment Offer and planned "to exercise our option of negotiating a mutually agreeable sale of the [Station]."  Phillips Decl. Ex. J.  On February 22, 2012, Defendant took title to the Station that it had agreed to buy from Exxon in June 2011.  Tourek Decl. ¶ 8.

In early 2014, Defendant performed a divestment

analysis to determine whether it would be beneficial to divest itself of several gas stations, including Mrs. Yi's Station, or whether it should enter sale-leaseback transactions for those sites. Tourek Decl. ¶ 12. Between February and July 2014, Defendant used a broker to gather purchase offer prices from third parties for the relevant gas Stations. Id. The third-party offer for Plaintiff and Mrs. Yi's Station was $3.6 million. Id.

Plaintiff emailed Defendant on March 5, 2014, stating that he would seek to move forward with the sale "for the asking price." Phillips Decl. Ex. K, at 2. On March 18, 2014, Mrs. Yi and Defendant executed a Contract of Sale and Station Lease ("Contract of Sale and Lease"), formalizing their franchisor-franchisee relationship. Tourek Decl. Ex. 2. That same day, Mrs. Yi executed a "Successor in Interest Designation" form ("Successor in Interest Form"), designating Plaintiff as primary successor in interest and Elizabeth Yi as alternate successor in interest pursuant to the terms in the Contract of Sale and Lease. Phillips Decl. Ex. I.

On May 29, 2014, Defendant sent Mrs. Yi a Non-Binding Letter of Intent inviting her to make an offer to purchase the Station, stating that it would consider the "highest and best offer." Phillips Decl. Ex. M. Plaintiff offered to purchase the Station from Defendant for $2.6 million in a Letter of Intent dated

4

June 29, 2014.  Decl. of Mark Yi ("Yi Decl.") Ex. 6.
On October 1, 2014, Defendant counter-offered to sell
the Station for $3.6 million.  Phillips Decl. Ex. N.
Plaintiff did not counter back.

Mrs. Yi died intestate on November 11, 2015.
Phillips Decl. Ex. B, at 20:7-9.  On December 22, 2015,
Plaintiff emailed Defendant stating that he "would like
to execute the survivorship" for the Station.  Id. at
182:24-183:11.  On March 18, 2016, Defendant sent
Plaintiff agreements that would assign him the
franchise agreements as Mrs. Yi's successor in interest
("Assignment Agreements").  Phillips Decl. Ex. B, at
192:23-24; Ex. P.  Plaintiff never executed them.  Id.

Plaintiff continues to operate the Station and pays
higher rent in light of the $3.6 million appraisal.
Tourek Decl. ¶ 17.  Upset that Defendant did not sell
him or Mrs. Yi the Station at Exxon's bona fide offer
price or at the equivalent of October 2011 fair market
value, Plaintiff filed the instant action.

**B.  <u>Procedural Background</u>**

Plaintiff filed his Complaint on March 7, 2016 in
the Los Angeles Superior Court [1-1].  Defendant
removed the action to federal court on March 31, 2016
[1].  The Complaint asserted the following causes of
action: (1) breach of contract; (2) breach of the
covenant of good faith and fair dealing; (3) fraud; (4)
unfair competition in violation of California Business
& Professions Code § 17200 *et seq.*; (5) violation of

California Business & Professions Code § 21140.6.

On April 6, 2017, Defendant filed a Motion for Summary Judgment as to the entire Complaint or, in the alternative, Partial Summary Judgment as to Plaintiff's requests for expectation damages and specific performance of certain claims. Def.'s Ntc. of Mot. for Summ. J. 1:23-36, 3:5-16, ECF No. 30. Plaintiff filed its Opposition on April 26, 2017 [32], and Defendant filed its Reply on May 2, 2017 [36].

## II. FINDINGS OF FACT

1. On or about October 20, 2011, Exxon sent Mrs. Yi a letter, "Terms and Conditions of Bona Fide Offer" which offered to sell Mrs. Yi the Station for $2,611,000. Phillips Decl. Ex. D; Pl.'s Facts ¶ 11.

2. On or about October 7, 2011, Defendant sent Mrs. Yi a letter titled "Assignment Offer." Phillips Decl. Ex. E; Def.'s Stmt. of Undisputed Facts ("SUF") ¶ 11; Pl.'s Stmt. of Genuine Disputes of Material Fact ("Pl.'s Facts") ¶ 12.

3. The letter included the following provisions: "With this letter we are requesting that you assign to [Defendant] your rights to receive a bona fide offer (or a right of first refusal) from [Exxon]." Phillips Decl. Ex. E; Def.'s SUF ¶ 12(a); Pl.'s Facts ¶ 12(a).

4. The letter also included this provision: "We are wiling to sit down with you and negotiate a mutually agreeable sale of the [Station] to you

6

after [Defendant] closes its purchase of the [Station] from [Exxon]. Phillips Decl. Ex. E; Def.'s SUF ¶ 12(d); Pl.'s Facts ¶ 12(d).

5. The Assignment Offer does not set forth or refer to any timeframe respecting the negotiation of a mutually agreeable sale of the Station." Phillips Decl. Ex. E; Def.'s SUF ¶ 15; Pl.'s Facts ¶ 15.

6. Other than the Assignment Offer itself, Defendant made no other representations, either written or oral, to Mrs. Yi or Plaintiff respecting the Assignment Offer terms prior to its execution. Philips Decl. Ex. B, at 47:25-48:19; Def.'s SUF ¶ 17; Pl.'s Facts ¶ 17.

7. The sole communication between Plaintiff and Circle K prior to executing the Assignment Offer was a telephone call to Timothy Tourek in which Plaintiff inquired as to where he should fax the executed Assignment Offer. Phillips Decl. Ex. B, at 62:3-63:3; Def.'s SUF ¶ 18; Pl.'s Facts ¶ 18.

8. Mr. Yi followed up with a September 18, 2013 email expressing an interest in purchasing the Station. Phillips Decl. Ex. J; Def.'s SUF ¶ 30; Pl.'s Facts ¶ 30.

## III. DISCUSSION

### A. <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment" when the movant "shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" for purposes of summary judgment if it might affect the outcome of the suit, and a "genuine issue" exists if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The evidence, and any inferences based on underlying facts, must be viewed in the light most favorable to the opposing party. Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327, 1329 (9th Cir. 1983).

Under Rule 56, the party moving for summary judgment has the initial burden to show "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000). The burden then shifts to the non-moving party to produce admissible evidence showing a triable issue of fact. Nissan Fire & Marine Ins., 210 F.3d at 1102-03; see Fed. R. Civ. P. 56(a). Summary judgment "is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard "provides that the mere existence of *some*

alleged factual dispute between the parties will not
defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no
*genuine* issues of *material* fact." <u>Anderson</u>, 477 U.S.
at 247-48.

**B.** **Discussion**

Defendant asks the Court to grant summary judgment
as to all five claims in the Complaint.[1]

1. <u>Motion for Summary Judgment</u>

a. *Plaintiff's Capacity to Sue*

As a preliminary matter, the Court considers
whether Plaintiff has capacity to sue on behalf of his
deceased mother, Mrs. Yi. <u>See</u> Def.'s Mot. for Summ. J.
("Mot.") 20:16-17.

For an individual acting in a representative

---

[1] Plaintiff also seeks judicial notice of Mr. Tourek's
Declaration in <u>Light Petroleum Inc. et al. v. Exxon Mobil Oil
Corp. et al.</u>, Case No. 12-CV-04689-PA. Pl's Req. for Judicial
Ntc. ("Pl.'s RJN") ¶ 1, ECF No. 33. Plaintiff also seeks
judicial notice of the Declaration of Donald J. Salamack in the
same case. <u>Id.</u> at ¶ 2. At the time of his declaration, Mr.
Salamack was Manager, Global Projects for Exxon Mobil Corporation
Fields, Lubricants & Specialties Marketing Company, an
unincorporated division of Exxon. The Court **GRANTS** Plaintiff's
Request for Judicial Notice [33] and takes judicial notice of the
Salamack and Tourek Declarations for their existence, but does
not accept as true the facts or allegations alleged in these
documents. <u>Peel v. Brooks Am. Mortg. Corp.</u>, 788 F. Supp. 2d
1149, 1158 (C.D. Cal. 2011).

Defendant makes several evidentiary objections [36-4] to the
Mark Yi Declaration in support of the Opposition [32-2]. Upon
review of the objected-to evidence and Defendant's bases for its
objections, Defendant's evidentiary objections are **OVERRULED** [36-
4] either because the objections are without merit or because the
Court does not rely on the objected-to evidence.

capacity, capacity to sue is governed by the law of the individual's domicile. Fed R. Civ. P. 17(b)(1). Because Plaintiff is domiciled in California, compl. ¶ 1, California law governs. Pursuant to California Code of Civil Procedure § 337.30, a decedent's personal representative or if none, successor in interest, may commence an action on the decedent's behalf. Section 337.32 further provides that the successor in interest file an affidavit or declaration that includes information establishing their right to proceed on behalf of the decedent.

Defendant avers that Plaintiff, as Mrs. Yi's successor in interest, lacks capacity to sue because he did not file the requisite affidavit. Mot. 22:11-12.[2]

Although Plaintiff did not vigorously comply with section 337.32, the facts at hand create at least a genuine dispute as to whether Plaintiff is a successor in interest with capacity to sue. On November 18, 2015, Plaintiff advised Defendant that Mrs. Yi died on November 11, 2015.[3] Decl. of Troy M. Mueller ("Mueller

---

[2] Defendant also argues that Elizabeth Yi, Plaintiff's sister, is an indispensable party pursuant to Federal Rule of Civil Procedure 19 who "potentially shares an equal right in the estate of her mother." Mot. 22:15-16. Defendant offers no caselaw or compelling analysis as to why the Court should deem her an indispensable party, and thus the Court does not delve into this issue.

[3] The Court notes that this at least partially complies with two requirements in section 337.32, that the successor in interest file a declaration stating (1) the decedent's name and (2) the date of the decedent's death.

Decl.") Ex. C, at 574. Subsequently, Defendant initiated work on Plaintiff's survivor documents to take over the Station. Id. at 573. On December 22, 2015, Plaintiff expressed its interest in "execut[ing] the survivorship" for the Station. Phillips Decl. Ex. O. While Plaintiff failed to execute the "Assignment Agreements" which would have assigned his mother's franchise rights to him, Phillips Decl. Ex. B, at 192:23-24, Defendant continued to treat Plaintiff as the successor in interest, accepting rent from him, training him, and sending him the Assignment Agreements. See Yi. Decl. ¶¶ 24, 25.

Strict adherence with a section 337.32 declaration is not required under Federal Rule of Civil Procedure 17(b). Bowoto v. Chevron Corp., No. C 99-02506 SI, 2006 WL 2455761, at *13 (N.D. Cal. Aug. 22, 2006). While section 337.32 offers a procedural formality to establish a party is a successor in interest, it does not explicitly define who qualifies as a successor in interest. Id. Rather, California Civil Code § 377.11 defines a successor in interest as "the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action . . . ." Considering Plaintiff's efforts to keep Defendant abreast of Mrs. Yi's death, his attempts to exercise his survivorship rights, and Defendant's continued treatment of him as a successor in interest, at the very least, a genuine dispute of material fact exists as to whether Plaintiff

has succeeded to Mrs. Yi's causes of action.  Thus, the Court does not grant summary judgment on this ground.

b.  *Breach of Contract*

Defendant requests summary judgment as to the breach of contract claim, as there is no genuine dispute of material fact whether Defendant breached the agreement to negotiate on the Station sale price.  Ntc. of Mot. for Summ. J. 2:9-11.

The elements for a breach of contract claim are: (1) a contract exists; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damages to plaintiff.  Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350, 1367 (Ct. App. 2010).

The parties disagree as to the meaning of certain Assignment Offer language.  The parties dispute whether Defendant breached the agreement to "negotiate a mutually agreeable sale" by offering the Station to Plaintiff for $3.6 million rather than matching Exxon's $2.6 million bona fide offer, and whether Defendant negotiated with Plaintiff after it "close[d] its purchase of the [Station]" from Exxon.

Contract interpretation is a question of law for the trial court.  Parsons v. Bristol Dev. Co., 62 Cal. 2d 861, 865 (1965).  California law allows a contract to be interpreted in a way that "give[s] effect to the mutual intention of the parties as it existed at the time of contracting."  Cal. Civ. Code § 1636.  The

parties' objective intent, demonstrated by the contract words and the contract as a whole, rather than the parties' subjective intent, controls interpretation. Titan Grp., Inc., v. Sonoma Valley Cnty. Sanitation Dist., 164 Cal. App. 3d 1122, 1127 (Ct. App. 1985).

If the parties disagree about the contractual meaning, the court should use a two-step approach. First, the court asks whether, as a matter of law, the contract terms are ambiguous; that is, the court considers extrinsic evidence to determine whether the contract is reasonably susceptible to a party's proffered interpretation. See Wolf v. Superior Court, 114 Cal. App. 4th 1343, 1351 (Ct. App. 2004). Second, if ambiguity persists, the court admits extrinsic or parol evidence to help interpret the contract. Id.

Defendant contends that the contract terms are unambiguous and even if they were ambiguous, the extrinsic evidence does not support Plaintiff's interpretation that Defendant should have matched Exxon's $2.6 million bona fide offer. Mot. 9:5-6, 20-21. Plaintiff counters that the language "mutually agreeable" and "after [Defendant] closes its purchase of the [Station] from [Exxon]" are ambiguous and require interpretation. Opp'n 11:20, 12:14. The Court discusses each of the terms Plaintiff disputes in turn.

                    i.  *Mutually Agreeable Sale*

The language "mutually agreeable sale" is not ambiguous from its plain meaning. "Mutually agreeable"

13

should be given its ordinary and popular meaning, Cal. Civ. Code § 1644; that is, that the parties acceded to an equally beneficial, fair price.

Ambiguity does not arise merely because a word or phrase has multiple meanings, and "ambiguity cannot be based on a strained instead of reasonable interpretation of the contract's terms." <u>Univ. Green Sol., LLC v. VII Pac Shores Inv., LLC</u>, Case No. C-12-5613-RMW, 2014 WL 1994880, at *2 (N.D. Cal. May 15, 2014)(internal citations and quotation marks omitted). Here, Plaintiff imputes a strained, unreasonable interpretation of "mutually agreeable" and seizes upon its broad, general language in order to advance his unsupported belief that Defendant would make an offer at $2.6 million or less. Yi Decl. ¶ 8. Plaintiff concedes that "mutually agreeable sale" ordinarily means that both parties should agree, but asks the Court to depart from this common understanding and interpret "mutually agreeable" with reference to Exxon's offer because Plaintiff assigned its existing bona fide offer from Exxon. Opp'n 12:3-8. In essence, Plaintiff interchanges "mutually agreeable" with his own subjective interpretation of the contract. <u>Ross Grp. Constr. Corp. v. Riggs Contracting, Inc.</u>, No. 12-CV-0246-CVE-FHM, 2012 WL 5511644, at *3 (N.D. Okla. Nov. 14, 2012)(agreement to create a "mutually agreeable" construction schedule did not lend itself to one party's understanding that he could revise the

schedule without the other's agreement).  But the sum total of the language "mutual," "negotiate," and "agreeable" belies Plaintiff's unilateral interpretation that Exxon's $2.6 million offer was the ceiling below which the parties had to negotiate.

The remainder of the written Assignment Offer does not support Plaintiff's interpretation.  First, the actual words of the Assignment Offer make no mention of the $2.6 million Exxon offer price, nor do they incorporate it by reference. <u>See</u> Phillips Decl. Ex. E. Although the contract need not explicitly state it incorporates another document, "reference to the incorporated document must be clear and unequivocal. The reference must be called to the attention of the other party, who must consent to it . . . ."  Cal. Civ. Practice Business Litig. § 24:11 (2017).  The Assignment Offer stated that Defendant understood "that [Exxon] would be providing you with the terms of a bonafide offer in the near future."  Phillips Decl. Ex. E.  But this does not mean that Defendant consented to Exxon's specific price as the point of reference for "mutually agreeable sale."  Plaintiff even admits that the Assignment Offer lacked any language that Defendant's offer would be $2.6 million and that "mutually agreeable" was not interchangeable with Exxon's offer price.  Phillips Decl. Ex. F 120:13-22; <u>cf. Bulloch Cellular, Inc. v. Alltel Commc'ns, LLC</u>, No. 1:09-CV-2186-RWS, 2009 WL 10664938, at *3 (N.D. Ga.

Dec. 23, 2009)(contract language required any partner to assign its ownership by making an offer to other partners through written notice, at the same price and on the same terms as the bona fide offer).  Here, unlike <u>Bulloch</u>, the contract language does not explicitly require the consideration in exchange for assignment of the Exxon bona fide offer to match the Exxon bona fide offer price.

Finally, even the extrinsic evidence, including the parties' course of conduct and actions, does not render Plaintiff's interpretation sufficiently reasonable. Plaintiff admittedly did not follow up with Mr. Tourek to discuss the offer and price terms before signing the Assignment Offer.  <u>See</u> Phillips Decl. Ex. B, at 47:25-48:19.  The parties do not dispute that Plaintiff only asked whether he could fax the Assignment Offer, Phillips Decl. Ex. B, at 108:24-109:3, 62:3-63:3; Pl.'s Facts ¶ 18.  And the parties do not dispute that Defendant never made any promises, oral or otherwise regarding the Assignment Offer terms prior to signing. <u>Id.</u> at 47:25-48:19; Pl.'s Facts ¶ 17.

Moreover, Defendant's internal emails also do not show it was reasonable to presume that "mutually agreeable" meant a Station price of $2.6 million or less, or an amount approximating fair market value in ///
///
///

2011, as Plaintiff later testified in his deposition.[4]
Indeed, Defendant informed Plaintiff that "mutually
agreeable sale" would encapsulate a more flexible
purchase price based on market changes and appraisal
variations. Mueller Decl. Ex. C, at 269 ("[I]nform
[Plaintiff] the $3.6M new value is his price if he
wants to purchase the site from us, as opposed to the
initial [bona fide offer] in 2011 at $2.611M.") And an
internal email where one of Defendant's agents said, in
response to the appraisal, "Ouch! $3.6M," is too
circumstantial to compel the conclusion that Defendant
understood $2.6 million was the offer price maximum.
At bottom, the extrinsic evidence suggests that
Plaintiff was allowed to make an offer and negotiate,
but could not expect that the parties would agree to
lock in a price comparable to fair market value in
2011. Because the negotiation time window was open-
ended, it was not reasonable that $2.6 million was the
hard ceiling for the Station's purchase price. See
Mueller Decl. Ex. C, at 633.
///

---

[4] During his deposition, Plaintiff offered a new theory of
contract interpretation: that the Assignment Offer gave him a
right to purchase the Station at fair market value in 2011.
Phillips Decl. Ex. B, at 114:-21-25. This slightly new
understanding is still unsupported by the Assignment Offer terms
and the parties' conduct. Moreover, the Court is unconvinced
that the change in Plaintiff's contract interpretation theory is
sufficient to create a genuine dispute of material fact.
See Nelson v. The City of Davis, 571 F.3d 924, 927 (9th Cir.
2009).

ii. "*After Defendant Closes its Purchase*"

Plaintiff also argues ambiguity exists in the clause "after [Defendant] closes its purchase of the [Station] from [Exxon]." Phillips Decl. Ex. E. Plaintiff argues that because Defendant would negotiate a mutually agreeable sale with Plaintiff after it closed its purchase of the Station from Exxon, this implies that Defendant would commence negotiations after its purchase and had a duty to inform Plaintiff when negotiations would start. Opp'n 12:19-25.

This phrase is not ambiguous. Plaintiff reads an unreasonable requirement into the contract language not borne out of the record. Plaintiff admitted that he suspected around January 2012 that Defendant closed its purchase of Exxon because he started paying rent to Defendant. Phillips Decl. Ex. B, at 107:8-108:2. But even if he had not been on notice that the sale had closed, the Assignment Offer contains no duty that Defendant had to inform Plaintiff of the next steps, and it is undisputed that the Assignment Offer did not expressly outline a timeline for how long after closing the sale Defendant would need to commence negotiations. See Phillips Decl. Ex. E; Pl.'s Facts ¶ 15.

With the contract interpretation issues settled, there are no genuine disputes of material fact that Defendant performed its obligations to negotiate pursuant to the Assignment Offer. On September 18, 2013, Plaintiff sent an email memorializing his

18

interest in purchasing the Station.  Phillips Decl. Ex.
J.  Contrary to Plaintiff's assertion that Defendant
never "sat down" with him, id. at Ex. B at 119:16-20,
Defendant set up an appointment for Plaintiff to meet
one of its representatives at Defendant's office.  Id.
at 142:4-19.  At that meeting, Defendant's
representative informed Plaintiff that the reappraisal
would not match Exxon's $2.6 million offer.  Id. at
143:8-13.  Moreover, Plaintiff admits that he and
Defendant negotiated in good faith beginning in October
2013, he agreed that the parties "negotiated to reach
an agreement," and he knew Defendant "intend[ed] to
negotiate as well," even though he felt the reappraisal
rendered the agreement a "sham," and he unilaterally
expected a lower offer price.  Id. at 150:1-25.
Plaintiff confuses the parties' failure to agree with
breach of contract; but in a contract to negotiate,
"[f]ailure to agree is not, itself, a breach of []
contract . . . rather, liability arises if a party
breaches its obligation to negotiate in good faith."
Because the Court has concluded that "negotiate a
mutually agreeable sale" did not obligate Defendant to
offer a sale at $2.6 million, and in light of
Plaintiff's repeated admissions that Defendant at least
negotiated as promised in the Assignment Offer,
Defendant did not breach the agreement.

In sum, Plaintiff's evidence regarding contract
interpretation relies heavily on subjective,

unexpressed intent, which "is of no moment in ascertaining the meaning of the words used in the instruments." <u>Mission Valley East, Inc. v. Cnty. of Kern</u>, 120 Cal. App. 3d 89, 97 (Ct. App. 1981). Because there are no genuine disputes regarding the breach of contract claim, the Court **GRANTS** summary judgment as to this claim.

### c.  *Breach of the Covenant of Good Faith and Fair Dealing*

California law implies a covenant of good faith and fair dealing in every contract. <u>Keshish v. Allstate Ins. Co.</u>, 959 F. Supp. 2d 1226, 1232 (C.D. Cal. 2013). "This covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." <u>San Jose Prod. Credit Ass'n v. Old Republic Life Ins. Co.</u>, 723 F.2d 700, 703 (9th Cir. 1984).

Plaintiff alleges that there are questions of fact whether Defendant violated the covenant of good faith and fair dealing, as Defendant knew of lower prices for the Station, it bought the Station for $1.7 million in 2012, its book value of the Station was $2.4 million, and it received offers from mid-2014 that were within Exxon's $2.6 million range. Opp'n 9:1-7. Plaintiff's allegations presuppose that the Assignment Offer contains an implied covenant to sell the Station to Plaintiff at least at the Exxon $2.6 million offer price. This is problematic for two reasons: (1)

Plaintiff's proposed covenant of good faith and fair dealing claim is duplicative of the breach of contract claim; and (2) Plaintiff's covenant of good faith theory also improperly reads requirements into the Assignment Offer.

A claim for breach of the covenant of good faith and fair dealing may be disregarded as superfluous if it "relies upon essentially the same allegations" as a companion "breach of contract claim." <u>In re Facebook PPC Adver. Litig.</u>, 709 F. Supp. 2d 762, 770 (N.D. Cal. 2010).

Plaintiff's covenant of good faith and fair dealing claim is superfluous to its breach of contract claim. Plaintiff alleges that Defendant breached the covenant of good faith and fair dealing by "soliciting offers from third parties, listing the property for sale with third parties[,]" and eventually offering to sell at a price which [Defendant] knew [Plaintiff] did not expect to pay." Compl. ¶ 26. The allegations that Defendant made a $3.6 million offer not agreeable to Plaintiff are reminiscent of the breach of contract allegations that Defendant "failed to make Plaintiff an offer at the Exxon offer price of $2,611,000," compl. ¶ 35, and that Defendant used Plaintiff's offer to "solicit higher offers from other bidders." The allegations for both claims deal with the discrepancy between Defendant's $3.6 million offer and the Exxon $2.6 million bona fide offer.

Summary judgment is also appropriate because Plaintiff changes the Assignment Offer terms to conform to his one-sided covenant of good faith theory.  In measuring the relevant duties for a covenant of good faith and fair dealing claim, the parties are confined to the contract's purpose and express terms.  <u>Delgado v. Nationstar Mortg. LLC</u>, No. 2:14-cv-02547-ODW(PJWx), 2014 WL 2115218, at *3 (C.D. Cal. May 21, 2014)(citation omitted).  "[A] party may not use the covenant to create additional rights not contemplated by the contract's term."  <u>Id.</u> (citing <u>Carma Dev. (Cal.), Inc. v. Marathon Dev. Cal., Inc.</u>, 2 Cal. 4th 342, 373 (1992).  As discussed in <u>supra</u> Part III.B.1.b.i, the specific terms of the Assignment Offer do not incorporate a duty for the "mutually agreeable sale" to match $2.6 million or lower.  Similarly, Plaintiff's theory—that Defendant's delay in disclosing it had acquired the Station from Exxon and overall delay in making Plaintiff an offer—imposes duties regarding timing that the parties did not contemplate.  As previously mentioned, Plaintiff does not dispute that the Assignment Offer does not create a timeframe for sale negotiations.  Pl.'s Facts ¶ 15.

The facts also do not clearly show Defendant's conduct was objectively unreasonable.  In his deposition, Plaintiff admitted that Defendant negotiated in good faith when it appraised the Station at a $3.6 million fair market value, but it acted in

22

bad faith by delaying the appraisal so that it could "continue collecting rent while the property value increased." Phillips Decl. Ex. B, at 150:1-9; Ex. C. But the facts do little to support this theory. On April 22, 2014, Plaintiff did indicate in an email to Defendant that because "significant time has passed and [ ] the value of the property has changed, [an offer differing from Exxon's] is not what we expected." Again, Plaintiff defines the covenant of good faith and fair dealing by his subjective, one-sided understanding of the Assignment Offer. Phillips Decl. Ex. L. The remainder of Plaintiff's evidence focuses on innuendo; for instance, Defendant showed its intent to delay negotiations or acted in bad faith when it "quickly ended the conversation" after Plaintiff mentioned he was waiting for Defendant to sell the Station to him. Yi Decl. ¶ 10. And Defendant's agents allegedly brushed him off, telling him "that's not my department" when he inquired about the purchase price. Id. at ¶ 12. Yet in his deposition, Plaintiff admitted that the parties negotiated, albeit not at the unilateral price he sought. Phillips Decl. Ex. B, at 150:1-25. Because Plaintiff has not demonstrated a genuine dispute regarding Defendant's bad faith actions, the Court **GRANTS** summary judgment for the covenant of good faith and fair dealing claim.

///

///

     d.  *Fraudulent Inducement*

  The elements of fraudulent inducement are (1) misrepresentation; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) damages. <u>City Solutions, Inc. v. Clear Channel Commc'ns.</u>, 365 F.3d 835, 839 (9th Cir. 2004).

  The record does not reveal a specific misrepresentation from Defendant that induced Mrs. Yi or Plaintiff to enter the Assignment Offer. Plaintiff testified and does not dispute that, outside of the Assignment Offer, Defendant did not make any misleading statements. In fact, Plaintiff did not have any conversations or follow-up regarding the Assignment Offer terms with Defendant. Phillips Decl. Ex. B, at 48:10-15, 56:14-57:19. On the due date of the Assignment Offer, Plaintiff contacted Mr. Tourek solely to ask if he could fax it to him. <u>Id.</u> at 62:2-63:3. As such, it is difficult to conclude that Defendant somehow misled Plaintiff to think that he would receive the Station for $2.6 million.

  Equally problematic for Plaintiff's fraudulent inducement claim is that it repeats the breach of contract allegations. Plaintiff alleges that Defendant breached the Assignment Offer by failing to make an offer at the $2.6 million Exxon price. Compl. ¶ 36. And he claims that Defendant fraudulently induced him to believe that he would be able to purchase the Station at Exxon's price. Compl. ¶ 48. But the

economic loss doctrine bars fraudulent inducement claims where the alleged misrepresentation is the contract itself.  <u>Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.</u>, 868 F. Supp. 2d 983, 993 (E.D. Cal. 2012).

Plaintiff vaguely alludes to the "circumstances" and "timing" of Defendant's $3.6 million offer as apt evidence of Defendant's fraudulent inducement.  Because Plaintiff offers little more evidence than this and because the fraudulent inducement claim is largely duplicative of the breach of contract claim, the Court **GRANTS** summary judgment as to the fraudulent inducement claim.

> e. *California Business & Professions Code § 17200*

California unfair competition law, California Business & Professions Code § 17200, polices "unlawful, unfair or fraudulent business acts or practices." "Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." <u>Cel-Tech. Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 181 (1999).

Defendant allegedly acted "fraudulently" by never intending to negotiate a mutually agreeable offer or one at $2.6 million.  Compl. ¶ 43.  To state a claim under the "fraudulent" prong of the UCL, a plaintiff must show that "reasonable members of the public are

likely to be deceived" by the alleged unfair business practice, though the "deception need not be intended." Rubio v. Capital One Bank, 613 F.3d 1195, 1204 (9th Cir. 2010)(internal quotations omitted). Neither Plaintiff's Complaint nor the attached exhibits and declarations explain why Defendant's conduct is likely to deceive members of the public. In fact, Plaintiff seemingly abandons his section 17200 claim in his Opposition, providing no legal argument or theory. See generally Opp'n.

Plaintiff alleges that Defendant acted "unfairly" by persuading Plaintiff to give up his statutory right of first refusal in exchange for a "mutually agreeable sale" that never came to fruition. Compl. ¶ 41. Beyond the bare allegations in the Complaint, Plaintiff also does not unpack how Defendant's conduct "unfairly" violates Plaintiff's right to a bona fide offer under any relevant California franchise or petroleum law, let alone California Business & Professions Code § 20999.25. Plaintiff alleges that Defendant solicited higher offers from third parties and made Plaintiff an offer that exceeded the understood purchase price. Compl. ¶ 41. These allegations are nearly identical to those raised in the breach of contract and implied covenant claims. Compare Id. with Compl. ¶ 26, and Compl ¶ 34. At their core, Plaintiff's section 17200 allegations concern the parties' contractual duties; but these common-law contractual duties are not the

state or federal law violations that section 17200 concerns. _Boland, Inc. v. Rolf C. Hagen (USA) Corp._, 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010). Because the record lacks sufficient evidence of "the requisite additional wrongfulness" section 17200 requires, the Court **GRANTS** summary judgment as to the section 17200 claim.

> f. *California Business & Professions Code § 21140.6*

California Business & Professions Code section 21140.6(a) provides, in relevant part: "it shall be unlawful to include in any franchise agreement any term which provides for the termination of the franchise by the franchisor upon the death of the franchisee if the franchisee, prior to his demise, designates a successor-in-interest in a form prescribed by and delivered to the franchisor."

Plaintiff argues that Defendant violated this section in the Assignment Agreements. Compl. ¶ 58; see Opp'n 19:12-20. The Assignment Agreement, where Defendant attempted to assign the franchise to Plaintiff as Mrs. Yi's successor-in-interest, has a paragraph entitled "Release," where Plaintiff agreed to release and discharge Defendant from any laws in connection with the Franchise Agreements. Yi Decl. Ex. 13, at § 5.

Plaintiff offers no language from the Assignment Agreements or caselaw that connect "release of all

claims . . including claims for violation of any law in connection with the franchise agreements" with any part of section 21140.6.  It is equally unclear to what extent Plaintiff can claim this violation, as it is undisputed that he never signed the "Assignment and Assumption Agreement."  Phillips Decl. Ex. B, at 192:23-24; Pl.'s Facts ¶ 53.  And the Contract of Sale and Lease between Mrs. Yi and Defendant—attached to the Assignment and Assumption Agreement—on its face does not violate section 21140.6(a).  It provides that "[designation] of a successor-in-interest upon the death of the [franchisee] shall be governed by California Bus. & Prof. Code § 21140.6. Absent [Mrs. Yi's] designation pursuant to the aforementioned California statute, this Contract shall terminate upon the death of the [franchisee]."  Ex. B. to Philips Decl. to Reply re Leave to Amend Ans., at § 36, ECF No. 26-3.  Section 21140.6(a) does not wholesale prevent a franchisor from terminating the franchise pursuant to a term in a franchise agreement.  Rather, this type of term is forbidden if the franchisee, prior to her death, designates a successor-in-interest.  As is evident from the language in the Contract of Sale and Lease, Defendant stated it would terminate the franchise upon Mrs. Yi's death should she fail to designate a successor-in-interest pursuant to section 21140.6.  This mirrors the language and purpose of section 21140.6(a).  Because Plaintiff offers no

cognizable explanation or genuine disputes of material
fact regarding the section 21140 claim, the Court
**GRANTS** summary judgment.

**IV. CONCLUSION**

Based on the foregoing, the Court
**GRANTS** Defendant's Motion for Summary Judgment as to
the entire Complaint [30].  The Clerk shall close this
action.

**IT IS SO ORDERED.**


DATED: June 26, 2017                    s/ RONALD S.W. LEW

                                        **HONORABLE RONALD S.W. LEW**
                                        Senior U.S. District Judge